1

2

3

4

5

6

7

8

9

**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

| | |
|---|---|
| PAUL MONTANEZ, | Case No.  1:12-cv-00250 AWI DLB PC |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BE GRANTED |
| v. | |
| VELASCO, et al., | [ECF No. 57] |
| Defendants. | OBJECTION DEADLINE: THIRTY DAYS |
| _____/ | |

16

17  **I.   Background**

18        Plaintiff Paul Montanez ("Plaintiff") is a state prisoner proceeding pro se and in forma

19  pauperis in this civil rights action.  Plaintiff filed this action on February 22, 2012.  He filed a First

20  Amended Complaint on November 5, 2012.  (ECF No. 13.)

21        On February 12, 2013, the Court issued an order finding cognizable claims against

22  Defendants Velasco and Murry for deliberate indifference in violation of the Eighth Amendment,

23  and against Defendant California Correctional Institute ("CCI") for violations of the Americans

24  with Disability Act ("ADA") and Rehabilitation Act ("RA"). (ECF No. 16.)

25        On July 2, 2014, Defendants filed a motion for summary judgment.  (ECF No. 57.)  On

26  August 25, 2014, Plaintiff filed an opposition and a declaration in support of his opposition.  (ECF

27  No. 61.)  Defendants filed a reply on August 29, 2014. (ECF No. 63).  This motion has been

28

1  submitted upon the record without oral argument.[1]  Local Rule 230(*l*).  For the reasons set forth

2  below, the Court recommends that Defendants' motion be granted.

3  **II.      Legal Standard**

4          Any party may move for summary judgment, and the Court shall grant summary judgment

5  if the movant shows that there is no genuine dispute as to any material fact and the movant is

6  entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted);

7  Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position,

8  whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular

9  parts of materials in the record, including but not limited to depositions, documents, declarations,

10 or discovery; or (2) showing that the materials cited do not establish the presence or absence of a

11 genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.

12 Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the

13 record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen

14 v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v.

15 Navajo County, Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

16         Defendant does not bear the burden of proof at trial and in moving for summary judgment,

17 he need only prove an absence of evidence to support Plaintiff's case.  In re Oracle Corp.

18 Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S.

19 317, 323, 106 S.Ct. 2548 (1986)).  If Defendant meets his initial burden, the burden then shifts to

20 Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial."  In re

21 Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323).  This requires Plaintiff to

22 "show more than the mere existence of a scintilla of evidence."  Id. (citing Anderson v. Liberty

23 Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

24         However, in judging the evidence at the summary judgment stage, the Court may not make

25 credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509

26

---

27 [1] Concurrently with his motion for summary judgment, Defendant served Plaintiff with the requisite notice of the
   requirements for opposing the motion.  Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154
28 F.3d 952, 960-61 (9th Cir. 1998).

F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), *cert. denied*, 132 S.Ct. 1566 (2012).  The Court determines *only* whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a pro se prisoner.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

**III.    Evidentiary Objections**

   A.    Defendants' Motion to Strike Plaintiff's Declaration

   Defendants object and move to strike Plaintiff's declaration on the ground that it is inadmissible based on failure to comply with Fed. R. Civ. P. 56(c)(4).  (ECF Nos. 62, 63.)  The Court declines to strike the declaration based on Defendants' relevancy objections.  Irrelevant information cannot create a triable issue of material fact, and the Court finds it unnecessary to undertake striking portions of declarations merely because they arguably lack relevancy.  E.g., Burch v. Regents of University of Cal., 433 F.Supp.2d 1110, 1119 (E.D. Cal. 1996).

   Accordingly, Defendants' motion to strike is denied.  To the extent Defendants raise specific objections to factual allegations, the Court will address the objections if the fact is to be considered.

**IV.    Plaintiff's Claim**[2]

   At the time of filing, Plaintiff was incarcerated at the California Correctional Institution for Men, in Tehachapi, California, where the events in the complaint occurred.  Plaintiff alleges that Defendants Velasco and Murry violated his rights under the Eighth Amendment.  Plaintiff alleges that Defendant CCI violated his rights under the ADA and RA.

---

[2] Plaintiff's complaint is verified and his allegations constitute evidence where they are based on his personal knowledge of facts admissible in evidence.  Jones v. Blanas, 393 F.3d 918, 922-23 (9th Cir. 2004).  The summarization of Plaintiff's claim in this section should not be viewed by the parties as a ruling that the allegations are admissible.

1    On November 13, 2008, Plaintiff underwent surgery on his right wrist where a pin and

2  screw were set in place to repair a non-healing schaphoid fracture.  On April 16, 2009, Plaintiff

3  underwent a second surgery to extract the pin.  On May 4, 2009, Plaintiff's primary care physician

4  issued him a comprehensive accommodation chrono, requiring Plaintiff to be cuffed with waist

5  chains and his hands at his sides at all times to prevent pain.  Plaintiff's physician instructed him

6  not to lift, pull, push, twist, or grab with his right hand, which was still in a cast as a result of the

7  surgery.

8    Plaintiff alleges that on June 25, 2009, he was in Receiving and Release ("RR") to be

9  transported to a scheduled orthopedic specialist for a follow-up on his surgery.  Defendants

10  Velasco and Murry were part of the transportation team.  Defendants utilized a chain restraint

11  system that went around Plaintiff's waist and had a black box on the front.  Plaintiff informed the

12  Defendants that he had a medical chrono that required waist chains be used, and that his hands are

13  to be cuffed to his sides, in order to prevent excruciating pain that results when Plaintiff's hand,

14  wrist and forearm are placed in awkward positions.  Defendants did not have mechanical leg

15  restraints, so they used a flex cuff on Plaintiff's right arm, above the cast, despite his reports of a

16  waist-chain chrono and complaints of pain. Plaintiff alleges that Defendants ignored him,

17  connected the cuffs to the black box in front of him and pulled the zip tie connecting the cuffs and

18  box all the way. Plaintiff was forced to slouch over in an awkward position. Plaintiff told

19  Defendants that according to doctor's orders and a chrono, he should not be restrained with flex

20  cuffs, but rather should be cuffed with waist chains, with his hands at his sides. Plaintiff also told

21  Defendants that he was in excruciating pain because the restraints were causing pressure to be

22  applied to his broken wrist. Plaintiff rode in the transportation vehicle for over two hours, causing

23  pain to his broken arm and cuts and bruises to his upper arm.

24    On June 25, 2009, Plaintiff's doctor stated that his hand was not fully healed and that he

25  could not push, pull, lift, grasp, or grab with his right hand. Plaintiff alleges that this condition

26  qualifies him as a person with a disability under the ADA.  Plaintiff alleges that his medical

27  chrono establishes that he was qualified to receive the benefit of waist chains. Plaintiff was

28  discriminated against when CCI officers refused to honor Plaintiff's waist chain chrono during

1    transportation to an outside hospital for treatment. As a result, Plaintiff suffered severe pain and

2    pressure to his wrist and lacerations to his forearms from the flex-cuffs that the officers used to

3    secure him. Plaintiff alleges that he suffered discrimination because of his disability and that CCI

4    receives federal financial assistance.

5         Plaintiff requests compensatory and punitive damages.

6    **V.      Undisputed Facts[3]**

7         1.      Plaintiff is currently detained at the Men's Central Jail in Los Angeles, California.

8    (Pl.'s Dep. 52:22-25; Pl.'s Decl. ¶ 1.)

9         2.      Plaintiff was an inmate at the California Correctional Institution ("CCI") on June

10   25, 2009, when Defendants allegedly violated his rights. (Pl.'s Dep. 12:4-7; Pl.'s Decl. ¶ 2.)

11        3.      Plaintiff is right-handed. (Pl.'s Dep. 14:23-25.)

12        4.      In March or April of 2008, Plaintiff fractured his right wrist playing basketball.

13   (Pl.'s Dep. 12:11-19; Pl.'s Decl. ¶ 3.)

14        5.      On November 13, 2008, Dr. Lee performed a surgery on Plaintiff's right wrist to

15   repair a fracture. (Pl.'s Dep. 12:11-14, 46:5-8; Pl.'s Decl. ¶ 4.)

16        6.      On June 25, 2009, Plaintiff had an appointment outside of CCI—in Palmdale,

17   California—to have his wrist examined by Dr. Lee. (Pl.'s Dep. 20:18-21:1, 33:13-16, 46:5-8;

18   Velasco Decl. ¶ 3; Pl.'s Decl. ¶ 6.)

19        7.      If an inmate has a medical appointment outside of CCI, officers escort the inmate

20   from his assigned cell to a holding cell inside the Receiving and Release (R&R) building. (Pl.'s

21   Dep. 23:12-24:6, 24:12-15.)

22        8.      After the inmate has been searched for contraband, the transportation officers escort

23   the inmate to a van that is parked in the driveway outside of R&R. (Pl.'s Dep. 23:5-24:3, 24:16-

24   18; Velasco Decl. ¶ 3.)

25        9.      Once the inmate is in the van, the transportation officers pick up their firearms at

26   the armory. (Pl.'s Dep. 24:22-25.)

27

28   _____
     [3] Facts which are immaterial to resolution of Defendants' motion for summary judgment, unsupported by admissible evidence, and/or redundant are omitted.

1          10.      After stopping to pick up their firearms, the transportation officers go to the front

2    gate of the prison to wait for other transportation vehicles that have the same destination. (Pl.'s

3    Dep. 24:25-25:3, 25:19-24.)

4          11.      On June 25, 2009, Plaintiff was assigned to live in the Security Housing Unit

5    ("SHU"). (Pl.'s Dep. 18:9-19.)

6          12.      The protocol for restraining a SHU inmate before transporting him to a medical

7    appointment involves conducting an unclothed body search in R&R, providing the inmate with a

8    temporary jumpsuit, and placing him in various restraints. (Velasco Decl. ¶ 3; Pl.'s Decl. ¶ 8.)

9          13.      The restraints placed on a SHU inmate before transporting him include leg irons

10    that go around his ankles, a chain that goes around his waist, and handcuffs. (Velasco Decl. ¶ 3.)

11          14.      There are two types of chains that go around an inmate's waist for transport: waist

12    chains and a "martin" chain.[4] (Velasco Decl. ¶ 3.)

13          15.      Waist chains have a single handcuff on each side of the chain when they are placed

14    around an inmate's waist. (Velasco Decl. ¶ 3.)

15          16.      A martin chain has one link that is a little bigger than the rest of the links in the

16    chain. (Velasco Decl. ¶ 3.)

17          17.      Handcuffs are connected to a martin chain by threading the handcuffs through the

18    bigger link in the martin chain. (Velasco Decl. ¶ 3.)

19          18.      When the handcuffs connected to a martin chain are secured around an inmate's

20    wrists, the inmate's hands are in front of him at the waist or abdomen level. (Velasco Decl. ¶ 3.)

21          19.      When the martin chain is used with SHU inmates, a black box is placed over the

22    links between the two loops of the handcuffs to further restrict the inmate's movement and prevent

23    him from picking or tampering with the lock. (Velasco Decl. ¶ 3.)

24          20.      Officers Velasco and Murry were responsible for restraining and transporting

25    Plaintiff to his doctor's appointment. (Wilson Decl. ¶ 3; Velasco Decl. ¶ 3; Murry Decl. ¶ 3.)

26          21.      Before June 25, 2009, Plaintiff had never had any confrontations with Velasco or

27    Murry and did not have any bad blood between them. (Pl.'s Dep. 48:12-17.)

28
---
[4] Plaintiff does not dispute that a martin chain goes around an inmate's waist.

1    22.    On June 25, 2009, Plaintiff had a comprehensive accommodation chrono (chrono)

2    from his doctor that indicated he needed to be restrained in waist chains. The chrono did not

3    indicate that Plaintiff's hands had to be cuffed at his sides.[5] (Ex. A to Am. Compl., ECF No. 10 at

4    p. 39, item number 23 titled "Other"; Pl.'s Dep. 35:20-36:3; Pl.'s Decl. ¶ 5.)

5    23.    Plaintiff told both Velasco and Murry multiple times, while he was in an R&R

6    holding cell, that he had a chrono for waist chains that permitted his right hand to be cuffed at his

7    side. (Pl.'s Dep. 36:15-37:3; Pl.'s Decl. ¶ 8.)

8    24.    Use of either a waist chain or a martin chain satisfies a chrono indicating that an

9    inmate needs to be restrained in waist chains.[6] (Velasco Decl. ¶ 5.)

10    25.    On June 25, 2009, Velasco or Murry[7] conducted an unclothed body search of

11    Plaintiff in R&R to look for weapons and other contraband. (Velasco Decl. ¶ 6; Pl.'s Decl. ¶ 8.)

12    26.    After conducting the unclothed body search, Velasco[8] threaded handcuffs through

13    the link in the center of a martin chain, secured the martin chain around Plaintiff's waist, and

14    secured one of the cuffs on Plaintiff's left wrist. (Velasco Decl. ¶ 6; Pl.'s Decl. ¶ 8.)

15    27.    Velasco could not secure the other handcuff loop around Plaintiff's right wrist

16    because Plaintiff had a soft cast on that wrist. (Velasco Decl. ¶ 6; Pl.'s Decl. ¶ 8.)

17    28.    Plaintiff told Velasco that he wanted leg irons over his right forearm instead of flex

18    cuffs. (Velasco Decl. ¶ 7.)

19    29.    Velasco did not apply leg irons over Plaintiff's cast because the length of chain

20    between the two cuffs is too long and would have given Plaintiff too much movement with his

21    right arm during the transportation. (Velasco Decl. ¶ 6.)

22    30.    Instead of placing leg irons over Plaintiff's right wrist, Velasco followed protocol

23    _____

24    [5] Plaintiff contends the waist chain chrono was issued "to promote proper healing." (Pl.'s Decl. ¶ 5.) Defendants object to this allegation under Fed. R. Evid. 602 in that Plaintiff is not a doctor and Plaintiff has submitted no evidence to support this allegation. Defendants are correct. In any case, the fact is not material to the decision.

25    [6] Plaintiff disputes that a martin chain also satisfies a chrono for waist chains. Defendants have submitted evidence that a martin chain satisfies a chrono for waist chains. Plaintiff cites no evidence to rebut Defendant's evidence.

26    [7] Defendant Velasco states he conducted the search of Plaintiff. Plaintiff contends it was Defendant Murry. Whether it was Velasco or Murry who searched Plaintiff is not material to the suit.

27    [8] Plaintiff disputes Defendant Velasco's statement that Velasco secured the restraints. Plaintiff contends it was Defendant Murry. It is not material to this case whether it was Murry or Velasco who secured the restraints.

28    Moreover, as Defendants point out, Plaintiff alleged in his amended complaint, at his deposition, and in his statement of disputed facts that it was Defendant Velasco who put him in restraints.

7

1    by applying plastic flex cuffs just above the cast on Plaintiff's forearm.[9] (Velasco Decl. ¶ 6; Pl.'s

2    Decl. ¶ 8.)

3          31.      Velasco put the flex cuffs on Plaintiff's upper forearm above his cast and cinched

4    the loop down to a one-finger gap between the forearm and the flex cuff so that Plaintiff would not

5    be able to pull the cuffs over his cast. (Velasco Decl. ¶ 6; Pl.'s Dep. 54:1-9; Pl.'s Decl. ¶ 8.)

6          32.      The flex cuffs had two loops, so Velasco attached the second loop to the other end

7    of the handcuffs that he had already applied to Plaintiff's left wrist and cinched it all the way

8    down. (Velasco Decl. ¶ 6; Pl.'s Decl. ¶ 8.)

9          33.      There would have been at least three inches between Plaintiff's right upper forearm

10    and the black box at his waist. (Velasco Decl. ¶ 6.)

11          34.      Velasco placed a small, plastic black box over the chain between the two loops of

12    the metal handcuffs that were used to secure Plaintiff's left hand. (Velasco Decl. ¶ 6.)

13          35.      The black box further restricted Plaintiff's movement and prevented him from

14    picking or tampering with the lock. (Velasco Decl. ¶ 6.)

15          36.      After the martin chain, handcuffs, and flex cuffs were all secure, Velasco placed leg

16    irons around Plaintiff's ankles. (Velasco Decl. ¶ 6; Pl.'s Dep. 29:22-30:17.)

17          37.      After Plaintiff was securely restrained, Velasco and Murry put Plaintiff in a van

18    outside of R&R. (Velasco Decl. ¶ 8; Murry Decl. ¶ 7; Pl.'s Dep. 29:22-30:17.)

19          38.      Before getting into the van, Plaintiff told Velasco and Murry that his wrist was

20    hurting and that he wanted the flex cuffs off. (Pl.'s Dep. 37:9-14.)

21          39.      Plaintiff complained to Velasco that the flex cuffs were on too tight and pinching

22    his skin. (Pl.'s Dep. 54:6-10.)

23          40.      Plaintiff complained that he was in a lot of pain because his fractured right wrist

24    was throbbing. (Pl.'s Dep. 30:4-8.)

25          41.      Plaintiff complained that the flex cuffs were too tight, hurting him, and causing

26    pain to his right arm and wrist. (Murry Decl. ¶ 6.)

27

28    [9] Plaintiff argues that Defendant Velasco did not follow proper protocol.  However, he submits no evidence to support this assertion, whereas Defendants have submitted evidence that Velasco's actions followed proper protocol.

8

1    42.    Murry drove to the armory to collect firearms and stopped at the front gate of the

2  prison. (Velasco Decl. ¶ 8; Murry Decl. ¶ 7; Pl.'s Dep. 29:22-30:17, 32:22-33:4.)

3    43.    Velasco's and Murry's supervisor, Sergeant Wilson, was in a vehicle behind them.

4  (Velasco Decl. ¶ 8; Wilson Decl. ¶ 3.)

5    44.    While Plaintiff was in the van, he continued to complain that the flex cuffs were

6  hurting his right arm and wrist and that he wanted the flex cuffs removed. (Murry Decl. ¶ 7; Pl.'s

7  Dep. 37:9-17.)

8    45.    As transportation officers, Velasco and Murry had to follow prison procedures and

9  protocol for restraining and transporting inmates. (Velasco Decl. ¶ 4; Murry Decl. ¶ 5.)

10    46.    If an inmate had a complaint regarding the way he was restrained for transportation,

11  Velasco and Murry could not go outside of prison procedures or protocol on their own. (Velasco

12  Decl. ¶ 4; Murry Decl. ¶ 5.)

13    47.    If an inmate had a complaint regarding the way he was restrained for transportation,

14  Velasco and Murry had to contact their supervisor, alert him to the inmate's complaint, and let

15  their supervisor decide whether to adjust the inmate's restraints or otherwise go outside of the

16  established procedures for restraining an inmate for transportation. (Velasco Decl. ¶ 4; Murry

17  Decl. ¶ 5.)

18    48.    When Murry stopped the van at the front gate, Velasco exited the van to speak to

19  Sergeant Wilson. (Velasco Decl. ¶ 8; Murry Decl. ¶ 7.)

20    49.    Velasco and Murry told Sergeant Wilson that Plaintiff was complaining that he

21  wanted leg irons instead of flex cuffs on his right wrist and that the flex cuffs were hurting his

22  right arm and wrist. (Velasco Decl. ¶ 8; Wilson Decl. ¶ 4; Murry Decl. ¶ 7.)

23    50.    Sergeant Wilson was familiar with Plaintiff because he had participated in

24  transporting Plaintiff to numerous doctor's appointments. (Wilson Decl. ¶ 3.)

25    51.    Sergeant Wilson knew what Plaintiff's injuries were and where he had pain.

26  (Wilson Decl. ¶ 3.)

27    52.    Sergeant Wilson knew that Plaintiff had broken a bone in his wrist and that the

28  reason he had a doctor's appointment on June 25, 2009, was to have his wrist examined. (Wilson

1  Decl. ¶ 3.)

2      53.    Sergeant Wilson was informed of the way in which Plaintiff had been restrained

3  while Plaintiff was in the van. (Velasco Decl. ¶ 8; Wilson Decl. ¶ 5; Murry Decl. ¶ 7.)

4      54.    Sergeant Wilson understood that Plaintiff had leg irons around his ankles, a plastic

5  flex cuff above his cast on his right wrist on the upper forearm, and a metal cuff around his left

6  wrist with the other end of the cuffs closed. (Wilson Decl. ¶ 5.)

7      55.    Sergeant Wilson had knowledge that the flex cuffs were connected to the empty

8  metal cuff in front of Plaintiff's body and that a black box was closed over the chain between the

9  metal cuffs and over the key holes. (Wilson Decl. ¶ 5.)

10     56.    Sergeant Wilson also understood that the cuffs in front of Plaintiff's body were

11  connected to a martin chain that went around his waist. (Wilson Decl. ¶ 5.)

12     57.    Sergeant Wilson determined that the way Velasco had used the restraint equipment

13  to restrain Plaintiff was appropriate. (Wilson Decl. ¶ 6.)

14     58.    Sergeant Wilson told Velasco and Murry that the restraint equipment had been

15  applied in an acceptable manner. (Wilson Decl. ¶ 6; Velasco Decl. ¶ 8; Murry Decl. ¶ 7.)

16     59.    Sergeant Wilson did not instruct Velasco to adjust or change the restraint

17  equipment used to restrain Plaintiff. (Wilson Decl. ¶ 6; Velasco Decl. ¶ 8.)

18     60.    Sergeant Wilson did not instruct Murry to adjust or change the restraint equipment

19  used to restrain Plaintiff. (Wilson Decl. ¶ 6; Murry Decl. ¶ 8.)

20     61.    Velasco and Murry transported Plaintiff to his medical appointment without

21  adjusting his restraint equipment. (Velasco Decl. ¶ 9; Murry Decl. ¶ 8.)

22     62.    Dr. Lee cut Plaintiff's cast off, examined his wrist to see how it was healing,

23  examined x-rays, and reapplied a hard cast. (Pl.'s Dep. 35:3-6, 46:9-15.)

24     63.    The flex cuffs were on Plaintiff's right forearm above the cast for a total of about

25  two and a half hours. (Pl.'s Dep. 37:18-38:2.)

26     64.    Plaintiff does not have any complaints about the manner in which he was

27  handcuffed on his way back to CCI after his medical appointment in Palmdale on June 25, 2009.

28  (Pl.'s Dep. 35:11-18.)

65.     When Velasco, Murry, and Plaintiff returned to CCI, Velasco followed protocol by immediately taking Plaintiff to see a nurse at the Facility B medical clinic. (Velasco Decl. ¶ 10; Pl.'s Dep. 41:2-10.)

66. Plaintiff complained to the nurse that he was experiencing pain in his wrist. (Velasco Decl. ¶ 10.)

67.     Velasco asked the nurse to conduct a 7219 and look at Plaintiff's wrist. (Velasco Decl. ¶ 10; Pl.'s Dep. 41:2-10.)

68. When a nurse conducts a 7219, he or she examines an inmate, writes down the inmate's verbal complaints, and marks down any objective signs of injury, such as cuts, bruising, bleeding, punctures, or swollen areas, and documents it on a CDC 7219. (Velasco Decl. ¶ 10.)

69.     The nurse examined Plaintiff's wrist two to three minutes after Plaintiff returned to CCI following his doctor's appointment. (Pl.'s Dep. 41:2-10.)

70.     The nurse who examined Plaintiff's wrist filled out a 7219, which Plaintiff attached to his complaint. (Pl.'s Dep. 41:19-21, 42:8-13.)

71.     The nurse who examined Plaintiff's wrist following his doctor's appointment on June 25, 2009, noted redness on Plaintiff's right forearm, but did not note any cuts, lacerations, blood, or any other injuries. (Ex. A to Am. Compl., ECF No. 10 at p. 40.)

**VI.    Discussion**

**A.     Deliberate Indifference**

1.    Legal Standard

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement.  Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 847, 114 S.Ct. 1970 (1994) and Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392 (1981)) (quotation marks omitted).  While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain.  Morgan, 465 F.3d at 1045 (citing Rhodes, 452 U.S. at 347) (quotation marks omitted).

Prison officials have a duty to ensure that prisoners are provided adequate shelter, food,

Case 1:12-cv-00250-AWI-DLB   Document 67   Filed 05/04/15   Page 12 of 17

1    clothing, sanitation, medical care, and personal safety, Johnson v. Lewis, 217 F.3d 726, 731 (9th

2    Cir. 2000) (quotation marks and citations omitted), but not every injury that a prisoner sustains

3    while in prison represents a constitutional violation, Morgan, 465 F.3d at 1045 (quotation marks

4    omitted).  To maintain an Eighth Amendment claim, inmates must show deliberate indifference to

5    a substantial risk of harm to their health or safety.  E.g., Farmer, 511 U.S. at 847; Thomas v.

6    Ponde*r*, 611 F.3d 1144, 1151-52 (9th Cir. 2010); Foster v. Runnels, 554 F.3d 807, 812-14 (9th Cir.

7    2009); Morgan, 465 F.3d at 1045; Johnson, 217 F.3d at 731; Frost v. Agnos, 152 F.3d 1124, 1128

8    (9th Cir. 1998).

9          The deliberate indifference standard involves an objective and a subjective prong.  First,

10   the alleged deprivation must be, in objective terms, "sufficiently serious . . . ."  Farmer, 511 U.S.

11   at 834 (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)); Hearns v. Terhune, 413 F.3d 1036,

12   1042 (9th Cir. 2005).  Second, the prison official must "know[] of and disregard[] an excessive

13   risk to inmate health or safety . . . ."  Farmer, 511 U.S. at 847; Thomas v. Ponder, 611 F.3d 1144,

14   1150-51 (9th Cir. 2010); Foster v. Runnels, 554 F.3d 807, 812-14 (9th Cir. 2009); Morgan, 465

15   F.3d at 1045; Johnson, 217 F.3d at 731.

16         Thus, a prison official may be held liable under the Eighth Amendment for denying

17   humane conditions of confinement only if he knows that an inmate faces a substantial risk of harm

18   and disregards that risk by failing to take reasonable measures to abate it.  Farmer, 511 U.S. at

19   837-45.  Prison officials may avoid liability by presenting evidence that they lacked knowledge of

20   the risk, or by presenting evidence of a reasonable, albeit unsuccessful, response to the risk.  Id. at

21   844-45.  Mere negligence on the part of the prison official is not sufficient to establish liability,

22   but rather, the official's conduct must have been wanton.  Farmer, 511 U.S. at 835; Frost, 152 F.3d

23   at 1128.

24         2.     Analysis

25         Plaintiff had an appointment to see his doctor for a follow-up visit on his fractured right

26   wrist.  Plaintiff had a soft cast on his right wrist.  Plaintiff was also a SHU inmate, and SHU

27   inmates are transported under a certain restraint protocol involving the use of leg irons that go

28   around the ankles, a chain that goes around the waist, and handcuffs.  There is no dispute that

12

1    Plaintiff had a comprehensive medical chrono indicating that he needed to be restrained in waist

2    chains due to his fractured wrist.  It is also undisputed that the use of a "martin chain" satisfies a

3    chrono for waist chains.  Plaintiff was placed in a martin chain such that handcuffs were threaded

4    through the link in the center of a martin chain, the martin chain was secured around Plaintiff's

5    waist, and one of the cuffs was secured on Plaintiff's left wrist.  Since Plaintiff's right wrist was in

6    a soft cast, the other cuff could not be secured to the wrist.  Therefore, a flex cuff was placed

7    above the cast and secured to the chain.  Plaintiff requested a leg iron be placed on his arm instead,

8    but Defendant Velasco denied the request because the length of chain would have been too long

9    when using leg irons and would have provided Plaintiff with too much movement during

10   transportation.  Plaintiff complained of pain due to the flex cuff, and Defendants responded by

11   inspecting the cuff and confirming it had been applied correctly.  The way in which Plaintiff was

12   restrained as he was seated in the van resulted in Plaintiff's arms hanging down in front of him

13   with his right elbow and left wrist resting at his waist.  Under these facts, the manner in which

14   Plaintiff was restrained was not so extreme as to rise to the level of a constitutional violation.  The

15   restraint served the clear penological purpose of preventing Plaintiff's escape.

16          Plaintiff argues that he continued to complain of pain to his wrist due to the flex cuff.  It is

17   undisputed that there were no other reasonable restraint options available at the time, and Plaintiff

18   was advised that this was the manner he would be transported or he could opt not to be

19   transported.  Plaintiff chose to continue with the transport.  He continued to complain of pain.

20   Defendant Murry inspected the restraint.  Defendants then contacted their supervisor, Sergeant

21   Wilson.  Plaintiff contends that Defendants delayed for 45 minutes before contacting Sergeant

22   Wilson.  However, Plaintiff submits no evidence that Defendants were in a position to speak with

23   their supervisor prior to when they did.  Defendants informed Sergeant Wilson of the manner in

24   which Plaintiff was being restrained and Plaintiff's complaints of pain.  Sergeant Wilson was

25   familiar with Plaintiff and his injury given he had participated in several transports involving

26   Plaintiff.  It is undisputed that Sergeant Wilson concluded that the restraint equipment had been

27   applied in a proper manner, and that Sergeant Wilson did not instruct Defendants Velasco or

28   Murry to adjust or modify the restraint in any manner.

1    After Plaintiff had been transported, he was seen by his doctor.  There is no evidence that

2  he suffered harm from the manner in which he was transported.  Upon Plaintiff's return to the

3  prison, he was immediately taken to a medical clinic concerning his complaints of pain from the

4  flex cuff.  A nurse examined Plaintiff's arm and noted redness to the right forearm but did not note

5  any lacerations, cuts, blood, or any other injuries.

6    Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff's

7  allegations do not constitute a sufficiently serious violation to rise to the level of an Eighth

8  Amendment violation.  Plaintiff was not subjected to excessive risk of harm to his health, and the

9  manner of restraint was not so extreme as to violate contemporary standards of decency and rise to

10  the level of a constitutional deprivation.  See, e.g., Centeno v. Wilson, 2011 WL 836747 (E.D.

11  Cal. 2011).  The conclusion that Plaintiff's allegations do not constitute a sufficiently serious

12  violation is supported by the lack of resulting harm.   In addition, there is no showing that

13  Defendants were deliberately indifferent to Plaintiff's complaints.  Wilson, 501 U.S. at 303.  The

14  evidence shows Defendants repeatedly checked on Plaintiff's restraints and conferred with their

15  supervisor regarding Plaintiff's complaints.

16    Accordingly, there is no dispute as to any material fact and Defendants are entitled to

17  summary judgment.  The undisputed evidence, when viewed in a light most favorable to Plaintiff,

18  does not establish an Eighth Amendment violation.

19    **B.    Qualified Immunity**

20    Qualified immunity shields government officials from civil damages unless their conduct

21  violates "clearly established statutory or constitutional rights of which a reasonable person would

22  have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).  "Qualified

23  immunity balances two important interests - the need to hold public officials accountable when

24  they exercise power irresponsibly and the need to shield officials from harassment, distraction, and

25  liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231, 129

26  S.Ct. 808 (2009), and it protects "all but the plainly incompetent or those who knowingly violate

27  the law," Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986).

28    As the Court has found that no constitutional violation has occurred, it need not further

14

1    discuss the issue of qualified immunity.

2          **C.     Americans with Disability Act**

3          Plaintiff claims that his wrist injury constitutes a disability for purposes of the Americans

4    with Disability Act ("ADA").  He claims that CCI excluded him from participating in a service,

5    program or activity, and is therefore liable for violating the ADA.

6          The Ninth Circuit has held that the ADA applies to inmates in state prisons.  Armstrong v.

7    Wilson, 124 F.3d 1019, 1025 (9th Cir. 1997).  Under Title II of the ADA, "no qualified individual

8    with a disability shall, by reason of such disability, be excluded from participation in or be denied

9    the benefits of the services, programs, or activities of a public entity, or be subjected to

10   discrimination by any such entity."  42 U.S.C. § 12132.  The ADA defines a qualified individual

11   with a disability as "an individual with a disability who, with or without reasonable modifications

12   to rules, policies, or practices, the removal of architectural, communication, or transportation

13   barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements

14   for the receipt of services or the participation in programs or activities provided by a public

15   entity." 42 U.S.C. § 12131(2).  "The term 'disability' means . . . a physical or mental impairment

16   that substantially limits one or more of the major life activities of [the] individual."[10]   42 U.S.C. §

17   12102(1)(A).  For purposes of § 12102, major life activities "include, but are not limited to, caring

18   for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting,

19   bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and

20   working." 42 U.S.C. § 12102(2)(A).

21          In 2009, the regulations set forth certain factors to be considered in determining whether an

22   individual is substantially limited in a major life activity, including:

23          (i) The nature and severity of the impairment;

24          (ii) The duration or expected duration of the impairment; and

25          (iii) The permanent or long term impact, or the expected permanent or long term

26   ---
[10] The term disability may also mean a record of such an impairment or being regarded as having such an impairment,
27   42 U.S.C. § 12102(2)(B), (C) (quotation marks omitted), but there is neither argument nor evidence that Plaintiff was
     disabled under those subsections, Coons v. Secretary of the U.S. Dept. of the Treasury, 383 F.3d 879, 886 (9th Cir.
28   2004).

15

1  impact of or resulting from the impairment.

2  29 C.F.R. § 1630.2(j)(2) (2009).

3      In this case, Plaintiff suffered a wrist fracture in March or April of 2008.  Surgery was

4  performed on November 13, 2008.  Plaintiff attended a follow-up appointment on June 25, 2009.

5  Plaintiff claims that the very limited use of his right hand as a result of his wrist injury as it existed

6  on June 25, 2009, qualifies as a disability for purposes of the ADA.  Defendants argue that the

7  wrist injury and associated limitations were only temporary.  In support, Defendants note that the

8  physician's instructions that Plaintiff relies on in support of his claim clearly indicate that the

9  physical limitations were temporary and would only last until July 5, 2009.  (ECF No. 13 at pp.

10 39, 60.)   In addition, Defendants note that the surgeon who performed the surgery stated he

11 believed the injury would take three months or longer to heal, but Plaintiff would regain motion

12 and function.  (ECF No. 13 at p. 53.)

13     The Court concludes that Plaintiff's wrist injury does not qualify as a disability under the

14 ADA.  Defendants are correct that the fracture is akin to a broken limb or sprained joint, which do

15 not qualify as disabilities under the ADA.  See 29 C.F.R. Part 1630 App. § 1630.2(j) (2009)

16 ("temporary, non-chronic impairments of short duration, with little or no long term or permanent

17 impact, are usually not disabilities. Such impairments may include, but are not limited to, broken

18 limbs, sprained joints, concussions, appendicitis, and influenza.")   Therefore, Plaintiff was not

19 disabled on June 25, 2009, under the ADA, and Defendants are entitled to summary judgment.

20     Defendants further persuasively argue that Plaintiff was not excluded from participating in

21 any of CCI's programs, services or activities.  Plaintiff claims that he was denied the benefit of the

22 service of having his "waist chain chrono" honored by CCI during transportation to his medical

23 appointment.  As previously discussed, however, the waist chain chrono was in fact honored.

24 Plaintiff was placed in a martin chain which satisfies the waist chain chrono.  Accordingly,

25 Defendants are entitled to summary judgment on Plaintiff's ADA claim.

26     **D.      Rehabilitation Act**

27     Plaintiff also raises a claim under the Rehabilitation Act ("RA"), which provides that "no

28 otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability,

16

1  be excluded from participation in, be denied the benefits of, or be subjected to discrimination

2  under any program or activity receiving Federal financial assistance."  29 U.S.C. § 749(a).  The

3  Ninth Circuit has held that the Rehabilitation Act applies to inmates in state prisons.  Armstrong,

4  124 F.3d at 1025.  "There is no significant difference in analysis of the rights and obligations

5  created by the ADA and the Rehabilitation Act."  Zukle v. Regents of Univ. of California, 166

6  F.3d 1041, 1051 (9th Cir. 1999) (citing 42 U.S.C. § 12133 ("The remedies, procedures, and rights

7  set forth in [the Rehabilitation Act] shall be the remedies, procedures, and rights [applicable to

8  ADA claims].")).  Therefore, Plaintiff's claim under the RA is analyzed in the same manner as his

9  ADA claims.  As the Court previously found, Plaintiff was not disabled on June 25, 2009, and

10  Plaintiff was not denied the benefit of any service, program or activity.  Accordingly,  Defendants

11  are entitled to summary judgment on Plaintiff's RA claim as well.

12  **VII.    Conclusion and Recommendation**

13       For the reasons set forth above, the Court HEREBY RECOMMENDS that Defendant's

14  motion for summary judgment, filed on July 2, 2014, be GRANTED, thus concluding this action

15  in its entirety.

16       These Findings and Recommendations will be submitted to the United States District

17  Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within

18  **thirty (30) days** after being served with these Findings and Recommendations, the parties may

19  file written objections with the Court.  Local Rule 304(b).  The document should be captioned

20  "Objections to Magistrate Judge's Findings and Recommendations."   Any response to the

21  objections must be filed within **ten (10) days** from the date of service of the objections.  Local

22  Rule 304(d).  The parties are advised that failure to file objections within the specified time may

23  waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

24  1991).

    IT IS SO ORDERED.

25

26    Dated:    **May 4, 2015**                    /s/ Dennis L. Beck

27                                       UNITED STATES MAGISTRATE JUDGE

28